No. 1905
Second Circuit Appeal

## MRS. FRANK SMITH v. DR. H. L. CROW

(Feb. 20, 1925, Opinon and Decree.)

*(Syllabus by the Editor.)*

1. **Louisiana Digest—Automobiles—Par. 4, 4a, 7.**

In a collision between an automobile and motorcycle, where it is proven that the automobile was on the right side of the road or bridge where the accident happened and that the motorcycle skidded into the automobile, thus injuring the motorcycle rider, held that the automobile driver was not negligent and the motorcycle rider was negligent.

2. **Louisiana Digest—Appeal—Par. 625.**

The finding of the trial court in matters of fact, namely, as to who was negligent in a collision between an automobile and motorcycle being manifestly correct is affirmed.

Appeal from the Second Judicial District Court of Louisiana, Parish of Bossier. Hon. T. F. Bell, Judge.

This is a damage suit for personal injuries arising out of a collision between an automobile and motorcycle.

There was judgment for defendant and plaintiff appealed.

Judgment affirmed.

Murff & Mabry, of Shreveport, attorneys for plaintiff, appellant.

Foster, Looney & Wilkinson, of Shreveport, attorneys for defendant, appellee.

CARVER, J. The plaintiff, on behalf of her minor son, sues for damages for personal injuries received by him when the motor cycle, on which he was riding, collided with an automobile owned and driven by the defendant. She alleges that the injury was caused by the negligence of the defendant in driving too fast and on the wrong side of the street or bridge where the collision occurred.

The defense is a denial of negligence and a plea of contributory negligence.

The boy, 16 years old at the time of the occurrence and about 18 at the time of giving his testimony, states, substantially that he was coming from Bossier City to Shreveport on the bridge at 10:30 or 11:00 o'clock on a dark and rainy night and when about ten feet from the intersection of the bridge with Lake street where is a right angle curve he saw Dr. Crow's automobile coming at about 20 miles an hour; that he, himself was going about ten miles an hour, that he was about three feet from the curb on his right; that he had lights on his motorcycle; that Dr. Crow was about three and a half feet from the curb on his, Crow's left; that Crow did not signal; that Crow made a sharp turn around the curve that when he saw Crow was going to hit him he threw on his brakes, which made his motorcycle skid and he was struck by the bumper of Crow's automobile on his right leg. He further says he was knocked about three feet before he stopped and that the automobile ran over his leg.

When asked:

"A. The doctor stopped his car immediately?
"A. It kind of skidded up to me.
"Q. Kind of skidded up to you?
"A. Yes, sir, about three feet."

He further states that where the accident occurred was about ten feet from Lake street, just as he was starting on the curve and that the bridge or street inclined downward towards the street.

He was asked these questions:

"Q. Do you remember stating to her (meaning Miss Mary Hodges) that the doctor had passed the pay station and that there was a little curve in the bridge

that shifted his light down the river and that that was the reason that you got on the wrong side of the bridge?

"A. I did not get on the wrong side.

"Q. Don't you remember telling her that that caused you to leave your side of the bridge?

"A. No, sir.

"Q. Don't you remember telling her that if you had known as much about that bridge as they that the accident would never have occurred?

"A. I did not tell her that.

"Q. You didn't tell her about how the accident happened?

"A. No, sir.

"Q. Is it not a fact that you told Miss Mary Hodges at the hospital that you were not familiar with the bridge and when the doctor's light shifted that you thought the car was in a different place?

"A. I made no statement to Miss Hodges."

There are two curves, the one mentioned by the plaintiff's son and another one some two hundred feet or more further on the bridge towards the Bossier side, the latter being much less abrupt than the other one.

There are also two pay stations on the bridge, the first one of which is about thirty yards towards the Bossier side from the sharp curve; the other one being about one hundred or more yards further.

Dr. Crow states that the accident happened "between the two pay stations, about 100 yards, I suppose from the pay station where the curve comes around, just about where the railway trains pass under the bridge".

He gives the following account of the accident.

"A. It was a very dark night and we had—I was driving up going around the curve after I had my toll and as I was coming around that curve I noticed a light in front of me,—very dim. It looked like a light that you sometimes see on a wagon at night.—it was such a dim light that I could not tell what it was. I saw it coming but it was twelve or fourteen feet away and I could not tell what the light was. When

it got within about eight feet from me—about eight or ten feet from me I saw then that it was a mortorcycle, I could see the boy's head. The boy had his head over he didn't appear to have seen anything. When he got within about four feet of the car he turned sharply to his left and his right leg hit the corner of my bumper. The boy was thrown on the right side of my car and just beyond him was the motorcycle. The car didn't run over the boy's body and I hardly touched him. I had thrown on my brakes and the car was practically at a standstil when the boy ran into me. He had no brakes and if he saw me he made no sign because he had his head down and didn't seem to be paying attention to anything.

"Q. Were you on your right hand side of the bridge?

"A. Yes, sir.

"Q. How fast were you driving?

"A. I had just shifted the gear,—ten or twelve miles per hour.

"Q. You were between the pay stations on the bridge?

"A. Yes, sir.

"Q. Then he was in error in saying that the accident happened down near the foot of the bridge near the curve?

"A. From what that boy tells from where the accident occurred—it must be two hundred (200) steps from where the accident occurred. The accident was not on the street but between the two pay stations.

"Q. And the bridge curves between the two pay stations?

"A. Yes, sir.

"Q. Now, you were in that curve when the accident happened?

"A. Yes, sir.

"Q. You had just shifted your gear?

"A. I had gotten through shifting and had thrown my car into high.

"Q. Now, Dr. Crow, you saw him and applied the brakes?

"A. Yes, sir."

By Mr. Murff: "Don't lead the witness."

By Mr. Wilkinson.

"Q. That is what he said a while ago?

"A. I threw on my brakes just as soon as I saw what it was. The boy came forward and turned his motorcycle sharply to the left. He had on no brakes and made

no attempt to stop, at all, and if he had even raised his right leg it would not have been hurt at all. His mortorcycle went far and my car didn't move at all from the time that we hit. When I got out of the car he was lying in front; as Miss Hodges stepped out of the car he was lying in front of the wheel. She was on the front seat. The motorcycle was lying up against—up most on the curb on the right side of the bridge,—up next to the side rail.

"Q. Your car stood there at that same point until you put him in the car and took him to the sanitarium?

"A. Yes, sir.

He further states that while his car was stopped at the scene of the accident, three cars passed going toward the Bossier side passing to his left.

It will thus be seen that there was a wide variance between the versions given by the principal participants, not only as to the manner but as to the place of the accident.

The boy was not corrborated by any witness to the affair, but plaintiff and two other witnesses testify to certain admissions made by Dr. Crow.

The plaintiff says:

"Q. How did he say it occurred?

"A. He said that is was his fault; that when he turned the curve so quick he didn't think of anything coming from the bridge at that time of night. I positively asked him if it was my boy's fault and he said no that it was his fault.

"Q. Why was it his fault?

"A. Because he was on the wrong side of the bridge.

"Q. Bridge?

"A. Road, as he was coming up the curve."

H. B. Weimer who, together with J. E. Bowen, was rooming at plaintiff's house, testifies as follows:

"Q. What did he say was the cause of it?

"A. He said, that as far as the boy was concerned that he was within his right. The conversation came up this way. Mrs. Williams said, when she was told that her boy got hurt, she said, I have been afraid of this all along that the boy would get hurt on the motorcycle. Whoever was talking said 'Mrs. Williams, I don't think he is seriously hurt, and anyway it wasn't his fault that he was hurt he was on the right side of the road or in his rights.

"Q. What was said about this man being on the wrong side of the road?

"A. I din't remember that he said anything about being on the wrong side; he said the boy was within his rights."

Bowen testified:

"A. Well, Mrs. Williams started to crying said it was 'Teddie',—that is what she called him,—said it was 'Teddie' and she come on out. I went on back to my bed and she talked with him. The doctor says, Don't blame the boy', says 'It isn't his fault'. He said it was an accident on his own part when he turned—when he made the turn to come around the bridge. It was in the sharp turn in the street and he kept to the wrong side of the street."

Bowen further testified, that on the day after the accident he went down to the bridge to examine the *locus in quo* and that at 40 or 50 feet from the sharp turn he saw marks that proved to be blood stains on the bridge and also marks where the mortorcycle had been dragged and that these marks were about four feet from the left hand side.

He further testified, that it had rained fairly hard the night before.

In the car with Dr. Crow were Leroy Horton, a distant cousin of his, Miss Alma Garland, who subsequently married this Horton, Miss Mary Hodges and a Miss Hamiter, the first three of whom corroborate, with more or less certainty, the version given by Dr. Crow in respect of his being on the right side of the road or bridge; as to the place of the accident; as to the speed at which he was traveling; and as to the cars passing them on their left while their car was halted.

Dr. Crow denies emphatically making the statements ascribed to him by the plaintiff, Bowen and Weimer. Leroy Horton states that he heard all that passed between Dr. Crow and the plaintiff and corroborates Dr. Crow in his denial. Miss Hamiter though summoned by defendant as a was on the front seat. The motorcycle the record does not show. She was present at the conversation between Dr. Crow and the plaintiff, but Mrs. Horton and Miss Hodges were too far away to hear this conversation.

Like the district judge, we attach no importance to the signs discovered by Bowen which he took to be blood stains and scratches made by dragging the motorcycle. These were forty or fifty feet from the place located by the boy as the scene of the accident from which place he says he was knocked only about three feet; but we are satisfied that the accident occurred not where the boy places it but at the second curve which is still further from the signs.

As to the admissions claimed to have been made by Dr. Crow, it is sufficient to say that the law regards this as the weakest species of evidence. That the second curve from the Caddo side was the place of the accident is shown by the testimony not only of Dr. Crow but also of Horton (page 88) Mrs. Horton (pages 114-115) and Miss Hodges (pages 102-103).

Horton says:

"Just about this curve—angle or whatever you call it on this bridge."
"Q. Had you passed the first pay station?
"A. Yes, sir.
"Q. Did you pay toll?
"A. Yes, sir."

Mrs. Horton says:

"Yes, sir, I know that we stopped and paid toll and then came on and we were just—you know the bridge turns when you are just at the top straight on the plane on the bridge and you know the bridge comes up and then it is flat and we were just at the top of the bridge."

Further (page 115):

"Q. You are sure that you had passed the toll house?
"A. I know it, positively.
"Q. You know positively that you had passed the first toll house?
"A. Yes, sir."

Miss Hodges says:

"Q. At what point on the bridge did the accident happen?
"A. Almost on the level of the bridge.
"Q. You had passed the first toll station?
"A. Yes, sir.
"Q. Had you paid your toll?
"A. Yes, sir."

She says, further:

"Q. Does that represent about where the accident happened?
"A. Yes, sir. I could not swear exactly because before hand I didn't know all of those details and after the accident really I think that is about the place. I don't know the exact point but it was almost on the level of the bridge."

Counsel construes this answer as showing uncertainty as to the place of the accident; but while it does show uncertainty as to the precise point all the witnesses agree it was at a curve and the witness is not uncertain as to having paid toll, and if correct about this it makes her answer certain that it was the second and not the first curve.

Plaintiff's counsel correctly argues, though, that the place of the accident is not so important as is the manner of it. Much more important are the questions, whether Dr. Crow was going fast or slow and whether on the right or left side of the bridge.

Horton states (page 88) that the speed limit was 10 miles an hour and that Dr. Crow was not exceeding it.

Mrs. Horton says (page 117) that Dr. Crow was going rather slowly.

Miss Hodges says (page 104) "Not very fast,—I don't suppose over ten miles."

That he was going slowly is further shown by the testimony as to his stopping quickly. Both Miss Hodges (page 104) and Mrs. Horton (page 117) say they think he stopped instantly. These three witnesses are equally clear that Dr. Crow was on the right side of the bridge.

Horton says (page 90):

"Q. Are you positive, Mr. Horton, that young Williams was on the wrong side of the bridge?
"A. Yes, sir, it could not be any other way. We didn't move the car. We picked him up and cars passed us on our left after we stopped."
These cars were going from Shreveport to Bossier City."

He further says that when stopped the car's right front wheel was three feet from the curb of the bridge on the right hand side.

Mrs. Horton says that Dr. Crow's car, when finally stopped was not right up against the side of the banister of the bridge but that there was enough room for cars to pass (meaning on the left). She thinks it was less than four or five feet.

Miss Hodges says (page 104):

"He wasn't on the extreme right; he was on the right of the bridge, all right, but he wasn't jamb to the banister."

Miss Hodges having her attention centered on the boy did not notice whether the cars passed to the right or left, but her answers taken as a whole show that the car was close to the right hand side and that they could have passed only on the left.

The testimony of these witnesses satisfies us that Dr. Crow was on the right hand side of the bridge and that he was not going very fast. The testimony is conflicting as to whether the bridge was well lighted or not. All parties agree that the accident happened just at a curve and the weight of the testimony showing that it was at the second curve just about the end of the incline and where the bridge becomes level, it seems to us the parties were not approaching each other head on until a very short distance before the actual collision but were approaching at an angle. Crow's light while coming up the incline would have passed over the boy until they got pretty close together even if coming head on; if approaching at an angle though as we think must have been the case, their lights would cross until both reached the curve.

Respecting the statement of Miss Hodges about which the boy was asked, she says:

"Q. Did he (the boy) make a statement at the sanitarium as to how the accident occurred?
"A. No, sir, he only discussed the accident. The only thing he told me was that he didn't know the curve on the bridge as well as we did and that if he had known—he saw our light shining straight ahead—he did not know that the curve was as much as it was; that was the thing that dazed him and he thought that he could go straight ahead.
"Q. Did he tell you that?
"A. He says that he doesn't remember it.
"Q. You remember him saying it?
"A. Yes, sir, I remember it and I am sorry that he does not remember it."

The District Judge inspected the locus in quo and gave a written opinion which shows that he carefully weighed and considered the evidence. Having heard and seen the witnesses with some or all of whom he is probably acquainted, he is in a better position to judge the credibility and weight of the testimony than we are.

Considering that the burden of proof is on plaintiff; that her son's version has so little corroboration and the defendant's

so much, we are not prepared to say that there was manifest error in the decision of the lower court in adopting the defendant's version; and if this version is correct, we agree with that court that the accident happened through the negligence of the plaintiff's son and not through the defendant.

Plaintiff's counsel argues that even if the boy was negligent, yet the plaintiff should recover because, as he says Dr. Crow had the last clear chance. Under his version of the affair, though, we do not think he did have such chance, and that doctrine, therefore, has no application.

The decision of the lower court is affirmed.